UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| RHONDA J. BEELER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:14-cv-00108 |
| | ) | Judge Sharp |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM**

Pending before the Court is Plaintiff's *Motion for Judgment on the Administrative Record* (Docket Entry No. 16). The motion has been fully briefed by the parties.

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's claim for Supplemental Security Income ("SSI"), as provided by the Social Security Act ("the Act"). Upon review of the administrative record as a whole and consideration of the parties' filings, the Court finds that the Commissioner's determination that Plaintiff is not disabled under the Act is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g). Plaintiff's motion will be denied.

**I. INTRODUCTION**

Plaintiff filed an application for SSI on February 14, 2012, alleging a disability onset date of September 20, 2005. The claim was initially denied on October 10, 2011, and upon reconsideration on December 22, 2011. Plaintiff had an initial hearing before an Administrative Law Judge ("ALJ") on June 11, 2013. On July 26, 2013, the ALJ issued a decision denying her

claim. Plaintiff timely filed an appeal with the Appeals Council, which issued a written notice of denial on October 1, 2013, thereby making the ALJ's decision the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g).[1]

## II. THE ALJ FIDNINGS

The ALJ issued an unfavorable decision on July 26, 2013. (AR pp. 53-60). Based upon the record, the ALJ made the following enumerated findings:

1. The claimant has not engaged in substantial gainful activity since May 12, 2011, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severed impairments: residuals of multiple fractures from a motor vehicular accident; status post multiple surgeries; nerve damage to upper left extremity; obesity; panic disorder with agoraphobia; major depressive disorder; learning disorder, not otherwise specified; posttraumatic stress disorder; bipolar disorder, not otherwise specified; and substance abuse in remission (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), except she is unable to climb ladders, ropes, and scaffolds. She is only frequently able to perform other postural activities. The claimant is unable to reach above shoulder level with her left arm. She is only occasionally able to handle, finger, feel, push, or pull with her left arm. She is able to understand, remember, and carry out simple instructions but is limited to work requiring infrequent changes in work setting and infrequent interaction with public.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on August 9, 1973 and was 37 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

---

[1] The Plaintiff previously received supplemental security income benefits from September 28, 2005 through October 2, 2008, at which time authorities incarcerated her and her benefits ceased.

7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimants age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since May 12, 2011, the date the application was filed (20 CFR 416.920 (g)).

(AR pp. 53-60).

## III. REVIEW OF THE RECORD

The following summary of the evidence of record is taken from Plaintiff's brief, Docket Entry No. 17 at pp. 2-9:

Rhonda Beeler is a 42 year old woman with a 10th grade education. On July 24, 2008, Rhonda Beeler was approved for disability based on severe impairments of fractures of the limbs and spine, permanent nerve damage to her left hand, and low I.Q. resulting in ability to perform sedentary work with only occasional stooping, ability to perform simple tasks, and a limited ability to work independently and deal with work stress. (Tr. 93-101). Ms. Beeler has not had significant improvement since that date. She has had surgery for nonunion of her femur and humerus, she continues to have nerve damage in her right hand, her low I.Q. is unchanged and her depression, PTSD, anxiety and bipolar condition have worsened.

PHYSICAL IMPAIRMENTS
On September 21, 2005, Ms. Beeler was seen at University of Tennessee Memorial Hospital. Orthopedic injuries included right clavicular shaft fracture, right both-arm forearm fracture, left scapular body fracture, left humerus fracture, left ulnar fracture, bilateral femoral shaft fracture, T4-6 spinous process fractures, and L1-5 right transverse process fractures. Associates injuries included bilateral pulmonary contusions, multiple rib fractures, renal contusion, and splenic laceration. She was initially intubated and not following commands. She underwent several surgeries and had a femoral non-union that was grafted in May 2006. In February 2007, she continued to have pain at the non-union area and at the area of the knee. She had some catching of the locking screw when she moved her knee. Radiographs showed some bridging boning anteriorly but still lucency at the fracture site was visible. Locking screws looked intact. Dr. Scott Smith

noted no improvement at that time. He gave options including removing the locking screws, living with the problem using a cane or crutches and modifying activity, and continuing her on Tramadol 15 mg two pills every six hours as he did not plan to do long-term narcotics. Repeat surgery would involve bone grafting. (Tr. 251-265).

Electromyography and nerve conduction studies dated April 13, 2006 reveal severe subacute incomplete involvement of the left radial nerve distal to the innervation of the triceps muscle with good active reinnervation occurring in the brachial radialis, extensor digitorum communis and extensor indices muscles, severe chronic incomplete involvement of the median nerve distal to the innervation of the flexor carpi radialis and pronator teres muscles with reinnervation being complete in the abductor pollicis brevis and flexor pollicis longus muscles, severe chronic incomplete involvement of the ulnar nerve in the forearm with reinnervation acute complete involvement of the ulnar motor fibers innervating the first dorsal interosseous muscle in the forearm with no active motor unit potentials present in that muscle. (Tr. 269-271, 293-296).

In January 2008, she was seen at Nashville General Hospital with left arm pain status post motor vehicle accident. She reported a history of 5 ORIF surgeries to her right hip, right arm, left arm, both upper and lower, and her right leg. She had non-union of both arms and legs. In June 2007, she was involved in a second motor vehicle accident and disrupted the healing process and loosened the hardware even more. She had been incarcerated since the summer of 2007. She had not been smoking or drinking since she had been in prison. She did not have any pain reported in January 2008 but it was difficult for her to use her hand and she had a lot of numbness and tingling in her hand. She had a history of heart murmur, depression, anxiety, neuropathic pain secondary to injury trauma and chronic pain secondary to trauma. Medications included Celexa, Buspar, Ibuprofen, Neurontin, Ibuprofen and Ultram. On January 23, 2008, Dr. Limbird performed a revision fixation of the left humerus. Ms. Beeler was placed in a sling and discharged on Percocet and Morphine. (Tr. 297-330).

On December 10, 2008, Dr. Thomas Limbird admitted Ms. Beeler to Nashville General Hospital for repair of a right femoral nonunion and a left humeral nonunion. (Tr. 293). In December 2009, she returned to Nashville General Hospital for left radial nerve palsy status post motor vehicle accident resulting in left humerus fracture. She had paralysis in the lower extremity secondary to nerve damage. She was unable to make a complete fist secondary to nerve damage. Occupational therapy was ordered twice weekly for two to four weeks. (Tr. 286-292).

On August 5, 2009, documentation from Tennessee Department of Corrections noted that Plaintiff was restricted to sedentary work only with lifting with the right hand only. No lifting with the left arm was allowed. No activity involving potentially dangerous machinery or equipment was allowed. She was assessed

with orthopedic disorder of the right leg and left arm, neurologic disorder of the left arm, hyperlipidemia and multiple fractures. (Tr. 359-360).

On May 25, 2011, providers at the Health department noted that Ms. Beeler had chronic pain. (Tr. 1060). On March 14, 2012, the Health Department noted Ms. Beeler to have hypertension, obesity, neuropathy and low Vitamin D levels. (Tr. 1099).

On June 23, 2012, Ms. Beeler fell on her outstretched arm and injured her left wrist. She was noted to have many orthopedic injuries. (Tr. 1106-1107).

On January 10, 2014, Ms. Beeler had a right ankle fracture that was treated at Cumberland Medical Center. She fell and fractured her ankle and had to have surgery, open reduction and internal fixation. During her hospitalization, it was realized that she had multiple fractures, not during that fall, but during previous falls, and the possibility of osteoporosis of unknown etiology. She was told by Dr. Hoover that it looked like her bones were older than a 40-year-old's bones. She was found to have a tri malleolar right ankle fracture for which Dr. Potter was consulted and she was admitted to the hospital for further management. Loss of range of motion was noted in her right hip and x-ray revealed a displaced bimalleolar ankle fracture with a Weber C type fracture of the fibula. The impression was displaced bimalleolar right ankle fracture; history of polytrauma multi-fractures; and chronic non-union right proximal femur. Chest x-ray revealed old fracture right clavicle. She was assessed with right ankle fracture, bipolar disorder, hyponatremia, hypokalemia and tobacco abuse. She had IV pain medicine including Demerol and medications during her stay for pain. After surgery, she did well. She was alert and oriented. Vital signs were stable at the time of discharge. She required DEXA scan sometime before she left. She had an appointment to follow up with orthopedics. Her discharge medications included Divalproex Sodium, Gabapentin, Sertraline HCl, Quetiapine Fumarate, Valproic Acid, and Hydrocodone/APAP. (Tr. 9-37).

MENTAL IMPAIRMENTS
On May 11, 2011, Ms. Beeler was seen at Volunteer Behavioral Health Services (VBHCS). She reported panic attacks which occurred once or twice a week with the following symptoms: rapid heartbeat, trembling, shortness of breath, smothering feeling, nausea, light headedness, fear of losing control and hot flashes. She only went out when she had to due to fear of becoming anxious. She reported depression which started four years earlier. Most days she had depression, loss of interest, concentration problems, feelings of worthlessness, hopelessness, low self-esteem, low energy, and excessive guilt feelings. She would sleep a lot. Depression caused her to avoid doing things, isolating even from family, getting angry easily, and causing relationship problems with her family. She was diagnosed with panic disorder with agoraphobia and major depressive disorder, recurrent, moderate. A GAF of 50 was assigned. (Tr. 1168-1208).

On May 18, 2011, she returned to VBHCS. Since being incarcerated, she had been on Buspar and Zoloft. When she left prison, she was advised to contact VBHCS. She had been taking Ultram as well, and recently had a reaction which sounded like a mild version of serotonin syndrome. She committed to stay in recovery with no benzodiazepines. She was amenable to therapy. She agreed that she would obtain Neurontin from her PCP. She had extensive nerve damage from her vehicle accident. She was assessed with major depressive disorder, recurrent, moderate, panic disorder with agoraphobia and a GAF of 50. Her medications were continued unchanged. (Tr. 1168-1208). On May 25, 2011, she reported depression with the same continuing symptoms. (Tr. 1172-1174).

On February 24, 2012, she was discharged from Volunteer Behavioral Health Care Center due to lack of contact. A diagnosis of major depressive disorder, recurrent, moderate and panic disorder with agoraphobia and a GAF of 50 were noted. (Tr. 1211).

On September 12, 2012, Ms. Beeler returned to VBHCS wanting her mood to improve and her panic attacks to stop. She reported depression and anxiety. She was tired all of the time with no energy. She cried a lot. She would sit in her bedroom which had no windows. She had gained weight of 45 pounds over the past year. She reported feeling this way for a year. She came for therapy, but she did not return and she went off her medication. She reported doing reasonably well until she stopped coming to Volunteer Behavioral Health Care Center. She reported her memory was impaired and she had the inability to complete sentences. She reported getting nauseated, muscle tension, dizziness, light headedness and weakness. She had panic attacks two to three times per month. She was scared to drive a car, especially in the rain. She had panic attacks when her father would fuss at her. She felt like a prisoner in her own room. She feared having panic attacks in front of others. She had panic attacks in public where she felt like she had to get out of a place. This was occurring several times per month. The usual duration was 15 to 30 minutes. She was sleeping in excess of 12 hours daily. She reported no drug usage. Deep breathing and relaxation exercises were taught and she was advised to identify and use thought changing skills and journal three times a week. Her current GAF was 50. She was diagnosed with major depressive disorder, recurrent, moderate and panic disorder with agoraphobia. (Tr. 1213-1225).

On October 9, 2012, when she returned to VBHCS, she reported that she sees shadows and she reported that she has periods of time of a week or longer in a severe "up" state with racing thoughts and insomnia followed by weeks of depression where she won't get out of bed and feels drained. At this time, she was being seen by her primary care physician at the health department where she was treated for blood pressure, cholesterol, and nerve damage to the left arm. She was taking Naproxen and Neurontin. On exam, her affect was constricted. Her mood was dysphonic and anxious. She exhibited blocking and derailment, impaired memory, impaired concentration, and impaired attention. She agreed to a case management referral and therapy services and trials of Zoloft and Valproic Acid.

She was diagnosed with major depressive disorder, recurrent, moderate and panic disorder with agoraphobia. A GAF of 50 was assigned. (Tr. 1228).

On October 9, 2012, Ms. Beeler returned to VBHCS with increased depression. She had previously taken Zoloft, Paxil, Wellbutrin, and Buspar. She reported that Wellbutrin gave her headaches. She reported she had gotten out of jail in May of the previous year. She had broken her left wrist and had previously broken arms on both sides. She reported that her bones break easily. She had agreed to start case management services. She reported that she occasionally hears and sees shadows. She has frequent dreams about her accident. She reported that her father treats her like a 15 year old. She had no alcohol or drug abuse noted. She was on parole until 2014. She reported that prior to her accident she was a polysubstance abuser, but THC dependent. (Tr. 1229-1230).

On November 6, 2012, Ms. Beeler returned to VBHCS due to anxiety. She reported her depression was much better, but her mood swings were not. She still had racing thoughts, jitters, and trembling hands. Her affect was constricted. Her speech was pressured. Her mood was anxious, mixed and dysphoric. Racing thoughts and flight of ideas were noted. Memory, concentration and attention were impaired. Supportive therapy was given. Lithium Carbonate 300 mg three times a day was started to decrease mood swings. She was diagnosed with bipolar disorder nos and agoraphobia with panic disorder. (Tr. 1233-1235).

She attended therapy on January 30, 2013. She was manic and talking non-stop throughout the session. She had difficulty concentrating. She was depressed and not sleeping well at all. Medicine was not helping like it was in the beginning. She reported being forgetful and having headaches. (Tr. 1250-1251).

On February 1, 2013, she went to VBHCS due to anxiety. She reported depression rated a 7 of 10 and mood swings an 8 of 10. She felt that Lithium was helping more than Depakote. Abilify was added to her medications for mood swings. Trazodone was prescribed for sleep. She was diagnosed with bipolar disorder nos and panic disorder wit agoraphobia. A GAF of 50 was assigned. (Tr. 1233-1235).

On April 9, 2013, Ms. Beeler returned to VBHCS and reported continued anxiety and mood swings. She stopped taking Lithium Carbonate because it made her feel strange. She felt Abilify helped control her mood better. She was diagnosed with bipolar disorder nos and panic disorder with agoraphobia. A GAF of 50 was assigned. (Tr. 1261-1263).

On May 7, 2013, she went to VBHCS. She had not filled Valproic filled due to a mix up. She had more depression and anxiety. She continued to have increased anxiety and mood swings. Zoloft and Trazodone were prescribed. Her diagnosis was unchanged. (Tr. 1268).

# IV. DISCUSSION AND CONCLUSIONS OF LAW

## A. Standard of Review

The determination of disability under the Act is an administrative decision. The only questions before this Court are: (i) whether the decision of the Commissioner is supported by substantial evidence; and (ii) whether the Commissioner made any legal errors in the process of reaching the decision. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010); *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986).

Substantial evidence has been defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)).

The Court must examine the entire record to determine if the Commissioner's findings are supported by substantial evidence. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit

findings and final determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

**B. Determining Disability at the Administrative Level**

The claimant has the ultimate burden of establishing her entitlement to benefits by proving her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d) (1)(A). The asserted impairment(s) must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(D); 20 CFR §§ 404.1512(a), (c), 404.1513(d). "Substantial gainful activity" not only includes previous work performed by the claimant, but also, considering the claimant's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which the claimant lives, or whether a specific job vacancy exists, or whether the claimant would be hired if she applied. 42 U.S.C. § 423(d)(2)(A).

In the proceedings before the Social Security Administration, the Commissioner must employ a five-step, sequential evaluation process in considering the issue of the claimant's alleged disability. *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001); *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must show that she is not engaged in "substantial gainful activity" at the time disability benefits are sought. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007); 20 CFR §§ 404.1520(b), 416.920(b). Second, the claimant must show that she suffers from a severe impairment that meets the twelve

month durational requirement. 20 CFR §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See also Edwards v. Comm'r of Soc. Sec.*, 113 F. App'x 83, 85 (6th Cir. 2004). Third, if the claimant has satisfied the first two steps, the claimant is presumed disabled without further inquiry, regardless of age, education or work experience, if the impairment at issue either appears on the regulatory list of impairments that are of sufficient severity as to prevent any gainful employment or equals a listed impairment. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 CFR §§ 404.1520(d), 416.920(d). A claimant is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability that ends the inquiry. *See Combs, supra*; *Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

If the claimant's impairment does not render her presumptively disabled, the fourth step evaluates the claimant's residual functional capacity in relationship to her past relevant work. *Combs, supra*. "Residual functional capacity" ("RFC") is defined as "the most [the claimant] can still do despite [her] limitations." 20 CFR § 404.1545(a)(1). In determining a claimant's RFC, for purposes of the analysis required at steps four and five, the ALJ is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. §§ 423(d)(2)(B), (5)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir.1988). At the fourth step, the claimant has the burden of proving an inability to perform past relevant work or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474. If the claimant cannot satisfy the burden at the fourth step, disability benefits must be denied because the claimant is not disabled. *Combs, supra*.

If a claimant is not presumed disabled but shows that past relevant work cannot be performed, the burden of production shifts at step five to the Commissioner to show that the claimant, in light of the claimant's RFC, age, education, and work experience, can perform other substantial gainful employment and that such employment exists in significant numbers in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)). *See also Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). In order to rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a claimant can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L. Ed. 2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). Even if the claimant's impairments prevent the claimant from doing past relevant work, if other work exists in significant numbers in the national economy that the claimant can perform, the claimant is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the five-step sequential evaluation process, the claim is not reviewed further. 20 CFR § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a claim at step two of the evaluative process is appropriate in some circumstances).

**C. Plaintiff's Assertion of Error**

Plaintiff argues that the ALJ erred (1) in finding Beeler had significant improvement since she was initially found disabled; and (2) in his evaluation of Beeler's mental restrictions. (Docket Entry No. 17 at pp. 14-18). Plaintiff contends that the Commissioner's decision should be "reversed and benefits should be granted or in the alternative, [] be remanded pursuant to Sentence 4." (*Id*. at 5).

Sentence four of 42 U.S.C. § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3). "In cases where there is an adequate record, the [Commissioner's] decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Additionally, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a claimant's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994). Plaintiff's assertion of error is addressed below.

*1. The ALJ erred in finding Beeler had significant improvement since she was initially found disabled*

Plaintiff argues that the ALJ erred in finding that she has improved since the last prior ALJ decision.[2] (Docket Entry No. 17 at 14). Plaintiff asserts the doctrine of res judicata requires

---

[2] That decision was issued by an ALJ in 2008 (Tr. 93). In that decision, Plaintiff was found "disabled" because there were no "other" jobs that she could perform that existed in significant numbers in the national economy (Tr. 100). This was based on a residual functional capacity finding limiting Plaintiff to

that the ALJ adopt the findings in a prior decision unless there has been substantial change since the prior decision. (*Id.*). Specifically, Plaintiff asserts that the ALJ is "bound by the findings of a claimants residual functional capacity." (*Id.*).[3] Plaintiff argues,

> The ALJ found Rhonda Beeler disabled in the initial decision, finding that she had restrictions that prevented less than sedentary work and that she had a low I.Q. Ms. Beeler's IQ has not changed. The initial ALJ decision gives full credibility to the report of Mark Loftis (a psychologist) in finding that Ms. Beeler has a low IQ and is restricted to simple tasks. (Tr. 98). The Administrative Law Judge in the more recent decision rejected the finding of the intimal ALJ of low IQ noting that he did not find support for that in the prior administrative law judge decision and because Dr. Deborah Morton (a medical doctor who is not a qualified psychological expert) opined that Ms. Beeler was of average intelligence, there was a significant change in the record. (Tr. 53). An IQ does not significantly change and the ALJ errs in finding that the low IQ is no longer a severe impairment.
>
> Additionally, Ms. Beeler has not shown significant improvement in her physical condition that justifies a reopening of the prior decision by the ALJ.
>
> \*\*\*
>
> Ms. Beeler's disability decision was terminated not because she had had medical improvement, but rather because she was incarcerated.
>
> \*\*\*
>
> At the time of the hearing, Ms. Beeler testified that she continues to have significant nerve damage in her left arm. She has no muscle mass and she still cannot make a fist or bend it. (Tr. 74). This testimony is supported by the assessment of Dr. Deborah Morton. (Tr. 1021). Her right lower arm has a rod and if she bumps it on anything it knots up. Her orthopedic doctor told her that the rod needed to come out because it was getting inflammation on it. (Tr. 75).

---

only sedentary type work, with occasional stooping and a limitation to work that involved simple tasks with a limited ability to work independently and to deal with workplace stress (Tr. 98).
Plaintiff was incarcerated in the Tennessee Prison for Women from August 2007 through May 2011 (Tr. 190). An individual is not eligible for SSI benefits for any month throughout which he or she was a resident of a public institution. *See* 20 C.F.R. §§ 416.201, 416.211. Plaintiff had to file the new application upon release from prison if she wanted to receive SSI benefits.

[3] Citing *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997), Plaintiff argues that the ALJ cannot "reexamine or predetermine the findings of a claimant's residential functional capacity or other issues previously determined in the absence of new and additional material evidence or changed circumstances." (*Id.*).

(*Id*. at pp. 14-16).

"Absent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ." *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997). An individual's residual functional capacity can change during a subsequent adjudicated period when more recent evidence shows improvement. *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 724-25 (6th Cir. 2013) (citing *Drummond*, 126 F.3d at 842).

In making his finding, the ALJ gave consideration to the legal standard in *Drummond*, in that he "may not make a different finding in adjudicating a subsequent disability claim unless new and additional evidence or changed circumstances provide a basis for finding different." (AR at p. 56). The ALJ, however, found that the medical evidence showed Plaintiff's medical condition had improved since the prior ALJ decision; and Plaintiff "agreed in her testimony that her condition had, 'to a certain extent.'" (*Id*.). Moreover, the ALJ found that Plaintiff's mental condition appeared "more precisely defined since her July 2008 decision listed only low IQ as a severe mental impairment." (*Id*.). Because of these changes, the ALJ did not keep the same residential functional capacity from the prior decision. The ALJ stated, [d]espite many barriers in her body, mind, and elsewhere that may discourage her, based on the record as a whole, including the opportunity to interact with [Plaintiff]… I conclude the claimant is able to perform the residual functional capacity outline above." (*Id*.). The ALJ also gave significant weight to the opinion of Dr. Knox-Carter, who was privy to the medical record, including the prior ALJ decision.

If the ALJ's findings are supported by substantial evidence in the record, his decision is conclusive and must be affirmed. *Warner v. Comm. Of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir.

2004). The Court therefore finds that substantial evidence supports the ALJ's determination that Plaintiff had significant improvement since she was initially found disabled in 2008.

*2. The ALJ erred in the evaluation of Beeler's mental restrictions*

Plaintiff further claims the ALJ erred in evaluating her mental restrictions by failing to find that she is significantly restricted by her mental impairments. (Docket Entry No. 17 at 16). Defendant counters,

> Plaintiff's argument is contrary to the ALJ's actual findings. The ALJ specifically found that Plaintiff's severe impairment that included these mental impairments: panic disorder with agoraphobia; major depressive disorder; learning disorder, not otherwise specified; posttraumatic stress disorder; bipolar disorder, not otherwise specified; and, substance abuse in remission (Tr. 53). The ALJ properly evaluated the severity of these impairments and found them severe (Tr. 53). A "severe" impairment is one that more than minimally affects the ability to work. *See* 20 C.F.R. § 416.921 (severe impairments).
>
> The ALJ's residual functional capacity also reflects the mental impairments that the ALJ found severe, while incorporating only those limitations that were found credible (Tr. 55).
>
> \*\*\*
>
> Here, the ALJ found Plaintiff not fully credible for several reasons. The ALJ properly evaluated Plaintiff's credibility in a manner that was consistent with SSA's regulations and policies. *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p.
>
> \*\*\*
>
> The ALJ's adverse credibility finding that she was "not entirely credible" (Tr. 56) was based on several factors. These included the objective evidence from the examination with Dr. Morton (Tr. 57); her course of treatment after leaving the Department of Corrections (Tr. 57-58); her starting and then ceasing mental health treatment (Tr. 58), her misconceptions about the work requirements imposed by employers concerning her education (Tr. 58); conflicts in her daily activities (Tr. 58); and her willingness to be active in the community (Tr. 58-59).

(Docket Entry No. 18 at pp. 9-11).

According to the ALJ, Plaintiff's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of Listings 12.02, 12.04, 12.06, or 12.09. (AR at p. 54). Plaintiff bears the burden of proving that her impairments meet or equal a listed impairment. *Sullivan v. Zebley,* 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). To meet this burden, Plaintiff must put forth evidence establishing that she meets all of a listing's criteria. *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) (citing 20 C.F.R. § 416.924(a). Plaintiff may also demonstrate disability by establishing that her 'impairments are equivalent to a listed impairment by presenting 'medical findings equal in severity to all the criteria for the one most similar listed impairment.'" *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (quoting *Sullivan*, 493 U.S. at 531). Regardless, "[t]his decision must be based solely on medical evidence supported by acceptable clinical and diagnostic techniques." *Land v. Sec'y of H.H.S.*, 814 F.2d 241, 245 (6th Cir. 1986) (citing 20 C.F.R. § 404.1526(b)). Here, ALJ found that Plaintiff has not met her burden of establishing that her mental impairments meet or are medically equal to a listed impairment. Subsequently, the ALJ found that despite the mental barriers, Plaintiff is still able to perform the residual functional capacity, which states as to her mental performance, "[s]he is able to understand, remember, and carry out simple instructions but is limited to work requiring infrequent changes in work setting and infrequent interaction with public." (AR at p. 55).

Plaintiff further suggests that the ALJ erred in substituting his judgment for that of a treating psychologist. (Docket Entry No. 17 at pp. 17-18). Plaintiff argues that the ALJ rejected a treatment report because she had a gap in treatment – and the ALJ believed she only returned because of her ALJ hearing. (*Id.*).

16

> As to this issue, the ALJ stated in his report the following:
>
> The claimant has received treatment for mental impairment . . . She went to Volunteer Behavioral Health Care System on May 11, 2011, May 18, 2011, and May 25, 2011, shortly after her release from prison and the day after she filed her disability application. She was diagnosed with major depressive disorder, recurrent, moderate, and panic disorder with agoraphobia.
>
> She did not return, however, and was discharged by the provider in February 2012 due to failure to attend her appointments. She presented again at Volunteer Behavioral Health Care System after more than a year on September 12, 2012, October 9, 2012, and November 2012, but then stopped once against until January 30, 2013, and February 1, 2013. Preceding he hearing, she came back on April 9, 2013 and May 7, 2013. Her diagnoses did not change throughout.
>
> \*\*\*
>
> While the claimant's starts and stops in mental health treatment raise questions . . . [and] the claimant's activities show less mental restriction than she alleges, the record clearly reflects some level of mental retardation.

(AR at p. 58). As the record indicates, although the ALJ did question the pattern of Plaintiff's mental health treatment, he acknowledged there was a level of mental retardation. And contrary to Plaintiff's assertion, the ALJ did not err in using his own judgment based on the record. The residual functional capacity does not need to be based on a particular medical opinion. *See Brown v. Comm'r of Soc. Sec.*, No. 14-6299, 2015 WL 2166706, at \*3 (6th Cir. May 8, 2015). The residual functional capacity does not need to correspond to a physician's opinion because the Commissioner has the final authority to make determinations or decisions on disability. *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 724-25 (6th Cir. 2013).

Here, the ALJ appears to have taken the entire record into account before rendering his decision. Consequently, the Court finds that substantial evidence supports the ALJ's determination of Plaintiff's mental restrictions.

## V. CONCLUSION

The Court concludes that the findings of the ALJ are supported by substantial evidence on the record as a whole, and are free from legal error. With such support, the ALJ's decision must stand, even if the record also contains substantial evidence that would support the opposite conclusion. *E.g., Longworth c. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005).

For all of the reasons stated, the Court will deny Plaintiff's *Motion for Judgment on the Administrative Record* (Docket Entry No. 16).

An appropriate Order shall be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE